Hayes **WILLIAMS** et al.,
**Plaintiff-Appellees,**

v.

**Edwin EDWARDS, Governor of the State
of Louisiana, et al.,
Defendants-Appellants.**

Nos. 75–2792, 75–3883.

United States Court of Appeals,
Fifth Circuit.

Feb. 15, 1977.

Rehearing Denied March 15, 1977.

Stanford O. Bardwell, Jr., Asst. Atty. Gen., William J. Guste, Jr., Atty. Gen., Baton Rouge, La., for defendants-appellants.

David L. Morgan, Jr., Luke J. Fontana, Jr., New Orleans, La., for plaintiffs-appellees in Nos. 75–2792 and 75–3883.

David J. Vanderhoof, Dept. of Justice, Washington, D. C., Douglas M. Gonzales, U. S. Atty., Baton Rouge, La., for plaintiffs-appellees in No. 75–2792.

Jessica Dunsay Silver, Dept. of Justice, Brian K. Landsberg, Washington, D.C., for amicus curiae.

Before COLEMAN, AINSWORTH and INGRAHAM, Circuit Judges.

AINSWORTH, Circuit Judge:

This is an appeal from a District Court decision that prisoner conditions at the Louisiana State Penitentiary at Angola violate the Constitution of the United States and certain laws of the State of Louisiana, and from its order that if the prison is to contin-

ue in operation it must be done constitutionally. The court ordered that certain specified and detailed relief, "immediate," "intermediate," and "long-range," be granted "to assure that if the State of Louisiana continues to operate . . . [the Angola Penitentiary], it does so in accordance with the Constitution and laws of the United States of America and in accordance with the Constitution and laws of the State of Louisiana." We affirm, but remand for further proceedings in accordance with this opinion.

This case originated when four Angola inmates filed actions in 1973 pursuant to 42 U.S.C. §§ 1981 and 1983, naming as defendants the Governor of Louisiana and the Warden of Angola, as well as other Louisiana state officials.[1] In their original complaint and amendments thereto the inmates alleged, among other things, that discrimination against minority inmates was practiced at Angola; that conditions at the prison violated the eighth and fourteenth amendment rights of the prison population as a whole; and that conditions at the prison violated the state fire and sanitation codes.

After the suit was filed the United States intervened on the issue of racial discrimination. Shortly thereafter the District Judge requested the United States to participate as amicus curiae on the other issues as well. The case was heard in December 1973 before a United States Magistrate acting as Special Master. Following unsuccessful attempts to resolve the cause by consent judgment the Special Master submitted his report to the District Court on April 28, 1975. Objections to the report were filed by the parties and heard by the District Judge on May 28, 1975. On June 19, 1975, the District Judge adopted the report of the Special Master without change. The defendants appealed, and asked this Court to stay the District Judge's order pending appeal. We granted a partial stay of the order concerning items pertaining to hiring

of additional corrections officers and installation of temporary housing, walls, and/or fencing upon condition that

> the appellants make a proper showing to the District Court that they have made reasonable and diligent efforts to comply with the terms of the judgment and order but are unable to do so because necessary funds have not been made available by the State and are not available from any other source, or that it is practically and physically impossible to achieve full compliance for valid and sufficient reasons.

Our order also provided that

> pending this appeal the District Court may exercise supervisory jurisdiction as to its judgment and order and in its discretion may grant or deny motions for stay relating to strict compliance with the terms thereof.

The record does not indicate that appellants ever offered to show the District Court the impossibility of compliance, so as to make the partial stay effective.

During the pendency of this appeal the United States moved for emergency relief regarding overcrowding at Angola. On September 5, 1975, the District Judge enjoined the appellants from accepting any new prisoners other than escapees and parole revokees until the Angola inmate population "is no greater than the designed capacity of that facility." The appellants have appealed from that order which has been consolidated with their appeal from the June 19 judgment and order. The consolidated appeal is now before us.

The District Judge found that conditions at Angola "shock the conscience of any right thinking person" and "flagrantly violate basic constitutional requirements as well as applicable State laws," and that "the State authorities, who have the power to do so, are either failing or refusing to take the necessary steps to correct these conditions." He adopted the Special Master's conclusions of law that inmate conditions as a whole at Angola violated the

---

1. Named also in the complaint were the Director of the Louisiana Department of Corrections, the Assistant Warden, Deputy Warden, Chief Security Officer, and other security officers.

cruel and unusual punishment prohibition of the eighth amendment, and that the system of medical care at Angola violated the eighth amendment as well as the due process clause of the fourteenth amendment. As conditions to the continued operation of Angola the District Judge developed a 15-page list of requirements concerning inmate protection, medical care, maintenance, repair, construction and safety, food and sanitation, racial discrimination and segregation, religious freedom, censorship of mail, conditions of punitive or administrative confinement and procedural due process. As long-range relief he required that the appellants develop and submit within 180 days a plan, including specific timetables and funding plans, for the future constitutional operation of Angola.

Appellants do not challenge the entirety of the District Court's order. Many of the provisions have already been complied with. They do object to portions of the order which they assert are beyond the authority of the District Judge. In particular, they dispute the authority of the District Judge under the eleventh amendment to make an order which they contend requires named officials "to divert funds otherwise appropriated by the Legislature" and requiring, in effect, "compliance by the sovereign state itself" because additional funds would have to be appropriated to comply with portions of the order. Appellants question whether the District Judge's finding of inadequate inmate security rises to constitutional proportions so as to support his requirement that 950 correctional officers be employed at Angola within six months of the order, and that two officers be present inside each inmate dormitory at all times. They also question the District Judge's enforcement of the Louisiana fire and sanitation codes at Angola. They question

whether the record supports the District Judge's finding of such severe overcrowding as to require enjoining further acceptance of new inmates, and to require construction of temporary housing, walls and fencing. They contend that the Angola medical care system is not so deficient as to amount to a constitutional violation. They argue that to require submission of a long-range plan within 180 days is unreasonable. Finally, appellants call for the convening of a three-judge district court to decide the issues in this case.

■ *Three-judge court.* We find that a three-judge court is not required in this case. Appellants contend that the relief ordered by the District Judge will directly require the expenditure of state funds, and therefore is a "federal decree that . . . legislative appropriations be reallocated or enjoined" requiring a three-judge district court, *Wyatt v. Aderholt,* 5 Cir., 1974, 503 F.2d 1305, 1318. Appellants' reliance on *Aderholt* is misplaced. The quoted dictum refers to a hypothetical, direct order of a federal judge that the state budget be revised. The order in the present case is different. It directs only that Angola not be operated at all if it is to be operated in a manner violating constitutional rights. *Aderholt* does not require a three-judge court under such an order; nor does *Sands v. Wainwright,* 5 Cir., 1973, 491 F.2d 417 (*en banc*), *cert. denied,* 416 U.S. 992, 94 S.Ct. 2403, 40 L.Ed.2d 771 (1974). *See, e. g., Leonard v. Mississippi State Probation & Parole Bd.,* 5 Cir., 1975, 509 F.2d 820, 822–23; *Newman v. Alabama,* 5 Cir., 1974, 503 F.2d 1320, 1327.

The gravamen of the defendants' contention that a three-judge court is required in the present case is their assertion that the District Court's order operates to enjoin a Louisiana appropriations statute and the Louisiana prisoner commitment statute.[2]

---

**2.** The full text of LSA R.S. 15:824 follows:

Notwithstanding any provision of law to the contrary, any individual subject to confinement in a state adult penal or correctional institution shall be committed to the Louisiana Department of Corrections; and not to any particular institution within the jurisdiction of the department. The director of cor-

rections shall assign each newly committed inmate to an appropriate penal or correctional facility. The director may transfer an inmate from one such facility to another, insofar as the transfer is consistent with the commitment and in accordance with treatment, training and security needs established by the department; provided, however, that no juvenile may be transferred to a penal or

However, the District Judge was careful not to enjoin operation of these statutes. In his Judgment and Order he explicitly addressed only "conditions and practices" in the operation of the prison at Angola. In substance what the District Judge held was that the terrible conditions at Angola, which are not disputed,[3] amount to a constitutional deprivation to its inmates, and that the defendants must comply with proper constitutional standards, which he specified, if the prison is to continue in operation.

To find that no statute or regulation is explicitly challenged does not end this inquiry, however. The "failure to challenge the constitutionality of a specific regulation will not vitiate the need to convene a three judge court, where the relief sought, if granted, would inexorably condemn those promulgated rules and regulations not specifically challenged." *Newman v. Alabama, supra,* 503 F.2d at 1326–27. In this regard the Supreme Court has said:

> It is necessary to distinguish between a petition for injunction on the ground of the unconstitutionality of a statute as applied, which requires a three-judge court, and a petition which seeks an injunction on the ground of the unconstitutionality of the result obtained by the use of a statute which is not attacked as unconstitutional. The latter petition does not require a three-judge court.

*Ex parte Bransford,* 310 U.S. 354, 361, 60 S.Ct. 947, 951, 84 L.Ed. 1249 (1940). Taking *Bransford* as our guide, we find that the practices sought to be enjoined were not "in effect, the application of administrative rules or regulations" which the defendants now seek to protect, *Leonard v. Mississippi State Probation & Parole Bd.,* 5 Cir., 1975, 509 F.2d 820, 823.

The appropriations statute is not "inexorably condemned" because the Legislature could choose to close the unconstitutional facilities rather than appropriate funds needed to bring them to habitable standards. Nothing in the order requires the Legislature to apply its funds other than as it wishes. That it has shown the wisdom to choose rehabilitation and expansion of facilities for Angola prison, as well as other Louisiana prison facilities, attests to its good judgment.

In a supplemental brief appellants contend that the three-judge court issue is foreclosed by our decision *en banc* in *Costello v. Wainwright,* 5 Cir., 1976, 539 F.2d 547. However, *Costello* does not control this case. The circumstances in *Costello* were unique. There a District Court order required that the overall prisoner population of the Florida Division of Corrections be reduced in certain specified stages for the reason that the facilities were unconstitutionally overcrowded. The only named defendant with authority to control prisoner population in Florida was Louie L. Wainwright, Director of the Division of Corrections. The en banc court held that the District Judge's order required Wainwright to refuse to accept prisoners. State law, however, commanded Wainwright as Director "with the compelling force of criminal sanction, to accept all prisoners lawfully committed to his care."[4] *Costello v. Wainwright, supra,* 539 F.2d at 550. Thus a constitutionally grounded coercive order directed toward a state official was brought into direct, irreconcilable conflict with a coercive state statute directed toward the same official. This constitutes "interdiction of the operation at large of [a] statute" as contemplated by the three-judge court statute, 28 U.S.C. § 2281.[5] *Morales v. Turman,*

---

correctional facility for persons committed by a court having criminal jurisdiction except in accordance with the provisions of R.S. 15:1062.

**3.** The facts are largely stipulated in this case. Twenty pages of factual stipulations are appended to the Special Master's report.

**4.** Fla.Stat. § 839.21 provides:
> Any jailer or other officer, who willfully refuses to receive into the jail or into his

custody a prisoner lawfully directed to be committed thereto on a criminal charge or conviction, or any lawful process whatever, shall be guilty of a misdemeanor of the first degree, punishable as provided in § 775.082 or § 775.083.

**5.** It appears that Wainwright did in fact refuse to accept prisoners in apparent contravention of the statute on two occasions. On a third occasion similar action "was rescinded upon strict orders issued Wainwright from the Gov-

5 Cir., 1976, 535 F.2d 864, 871; see *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 154–55, 83 S.Ct. 554, 560, 9 L.Ed.2d 644 (1963).

The instant case presents no such irreconcilable conflict. The Louisiana statute provides that prisoners "shall be committed to the Louisiana Department of Corrections and not to any particular institution within the jurisdiction of the department," and that the director "may transfer an inmate from one such facility to another, insofar as the transfer is consistent with the commitment and in accordance with treatment, training and security needs established by the department; . . . ." LSA R.S. 15:824. The only such facility affected by the order in this case is Angola. There is no irreconcilable conflict interdicting the operation of a statute as there was in *Costello.* This distinction as well as our past holdings, see, e. g., *Gates v. Collier,* 5 Cir., 1974, 501 F.2d 1291, and *Newman v. Alabama, supra,* direct us to the conclusion that no three-judge court is needed in this case.[6]

█ *Totality of conditions violate eighth amendment.* After extensive hearings the Special Master made findings of fact which were adopted by the District Judge. They are not disputed by defendants. Among the facts found were these: During the three years preceding the Special Master's hearings more than 270 stabbings of inmates by other inmates were reported; 20 deaths resulted. This deplorable condition is due to overcrowding and to lack of security. Numerous "forcible rapes" were committed on inmates by other inmates, the total number being unknown. Inmate dormitories were "terribly overcrowded" and insufficient cell space existed to segregate dangerous prisoners from the rest of the inmate population. The prison staff included too few guards to protect the inmates from one another through either supervision or through confiscation of weapons. Easy inmate access to unsupervised machinery and other resources resulted in widespread possession of weapons. Fire and safety hazards constituted an "immediate threat to the life and safety" of both inmates and staff. Multiple health and sanitation violations were in evidence, including accumulation of sewage under the main kitchen (since cleaned out) and including a "serious rodent problem." We have carefully reviewed the record in this case and find that it contains ample support for each of these findings.

In *Gates v. Collier,* 5 Cir., 1974, 501 F.2d 1291, we said:

Each factor separately, i. e., overcrowding dormitory barracks, lack of classification according to severity of offense, untrained inmates with weapons, lack of supervision by civilian guards, absence of a procedure for confiscation of weapons, may not rise to constitutional dimensions; however, the effect of the totality of these circumstances is the infliction of punishment on inmates violative of the Eighth Amendment, as determined by the trial court. [501 F.2d at 1309.]

With the exception of the use of inmate guards—recently terminated at Angola—the *Gates* excerpt could have been written with reference to the Special Master's report in the present case. Thus the District Judge was fully justified in finding that the totality of circumstances as to conditions of confinement at Angola amounted to a violation of the eighth amendment.

█ *The policy of federal courts in prison matters.* The Supreme Court has articulated for the federal courts a policy of

ernor of the State of Florida" and caused a mandamus action to be filed against Wainwright in state court by state law enforcement officials. *Costello v. Wainwright, supra,* 539 F.2d at 151 n. 16.

**6.** This case much more closely resembles *Gates* than *Costello* in such respects as the number and powers of named defendants, see *Costello v. Wainwright, supra,* 539 F.2d at 551 n. 15, and in that it affected only one facility. In

*Gates,* of course, we held that a three-judge court was not needed to promulgate an order similar to the one in this case, *Gates v. Collier, supra,* 501 F.2d at 1298–99; see also *Newman v. Alabama,* 5 Cir., 1974, 503 F.2d 1320, cert. denied, 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975); *Leonard v. Mississippi State Probation & Parole Board,* 5 Cir., 1975, 509 F.2d 820, cert. denied, 423 U.S. 998, 96 S.Ct. 428, 46 L.Ed.2d 373.

minimum intrusion into the affairs of state prison administration; state prison officials enjoy wide discretion in the operation of state penal institutions. *Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). This Court has been mindful of the policy; see, e. g., *Newman v. Alabama, supra,* 503 F.2d at 1328; *Campbell v. Beto,* 5 Cir., 1972, 460 F.2d 765, 767. We recognize, however, "that deference should be tendered only as to these necessary or essential concomitants of incarceration," *Newman v. Alabama, supra,* 503 F.2d at 1329. "But a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution." *Procunier v. Martinez, supra,* 416 U.S. at 405, 94 S.Ct. at 1807; see *Campbell v. Beto, supra,* 460 F.2d at 767–68. Constitutional limitations on state prison operation include the cruel and unusual punishment prohibition of the eighth amendment, see *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). The prohibition against cruel and unusual punishment "is not limited to specific acts directed at selected individuals, but is equally pertinent to general conditions of confinement that may prevail at a prison." *Gates v. Collier,* 501 F.2d at 1301. The equitable discretion of the District Judge is sufficiently broad to provide relief for all that is shown by the proof. *Newman v. Alabama, supra,* 503 F.2d at 1332–33, Fed. R.Civ.P. 8(f), 15(b). The District Court's order of extensive relief pertaining to constitutional infirmities in the prison as abundantly revealed by the proof was not an abuse of discretion but a reasonable exercise of judicial authority. *Cf. Newman v. Alabama, supra,* 503 F.2d at 1322; *Wyatt v. Aderholt, supra,* 503 F.2d at 1308.

*The eleventh amendment and the disbursement of funds.* The appellants challenge the authority of the District Judge to enter portions of his order requiring increased inmate safety measures and enhanced medical facilities. The appellants urge that "it is an illegal order for the federal court to *directly* order the state through its officials to use the funds. De-

fendants suggest that in view of the decision in *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662, such expenditures can only be the *indirect* effect of the judgment of the federal court." [Emphasis in the original.]

█ This argument misconstrues the nature of the District Judge's order. As already observed, the order does not require the spending of funds. It requires only that if the State of Louisiana continues to operate the Angola prison it must do so in accordance with the Constitution and laws of the United States and the State of Louisiana.

█ Further, appellants' argument regarding the authority of the District Judge overlooks prior definitive holdings of this Court on the subject of prison reform. It is within the authority of the District Judge to order that constitutional violations be rectified if the prison is to remain open. That the eleventh amendment is no bar to such relief is shown by our affirmance of the orders in, e. g., *Wyatt v. Aderholt, supra; Newman v. Alabama, supra;* and *Gates v. Collier, supra.*

*The eleventh amendment and the named defendants' authority.* The appellants contend that the District Judge lacked authority to order the appellants to perform actions, particularly to expend funds, beyond their statutory authority. Specifically they complain that the appellants are "unable personally" to comply with portions of the order potentially requiring expenditure of "large amounts of funds."

█ Having affirmed the District Judge's finding of unconstitutionality of the conditions at Angola we recognize his authority to order relief "coterminous with the scope of the constitutional violation found to exist," *Newman v. Alabama, supra,* 503 F.2d at 1332–33. Insofar as the appellants argue that they are prevented from complying with the order because of lack of funds or lack of authority to obtain or expend funds, we have said that

the obligation of the Respondents to eliminate existing unconstitutionalities does not depend upon what the Legislature

may do, or upon what the Governor may do, or, indeed, upon what Respondents may actually be able to accomplish. If [the State] is going to operate a Penitentiary System, it is going to have to be a system that is countenanced by the Constitution of the United States.

*Wyatt v. Aderholt, supra,* 503 F.2d at 1315, quoting *Holt v. Sarver,* E. D. Ark., 1970, 309 F.Supp. 362, 385. Thus lack of funds or authority over funds does not justify operating a prison in an unconstitutional manner.

■ The District Judge did not order the expenditure of funds by appellants. He only set the conditions under which the Angola prison could continue in operation constitutionally in the "immediate" and "intermediate" future. For the long-term future, his order contemplates appellants' formulation of their own plan for constitutional operation of Angola. In the immediate and intermediate future the order requires only that Angola not be operated in an unconstitutional manner. Compliance with the order may require as incidental and ancillary consequence the expenditure of state funds but that is not forbidden under *Edelman v. Jordan.* (See 415 U.S. at 667–68, 94 S.Ct. at 1357–58.) The District Judge's order was therefore fully in compliance with recent precedents of this Court on the same subject matter.

■ *Prisoner safety.* We have affirmed the District Judge's finding that the totality of conditions at Angola violated the eighth amendment rights of the inmates. The number of prison guards necessary to assure a constitutional level of inmate safety must bear some reasonable relationship to the total number of inmates. A proper ratio should be established by reference to the various kinds of facilities at the prison, taking into account the capacity and purpose of each, thereby determining the number of guards required to provide security

in each; or by proof showing usual adequate ratios established at other institutions where the level of prison violence is acceptable; by proof of learned studies, or by other proof acceptable to the District Judge.

We note from the appellants' supplemental brief that at the time the District Judge set 950 as the required number of guards at Angola, the inmate population was about 3,900. At the time the supplemental brief was written the number of guards had increased to about 800 and the number of inmates had declined to about 2,640. Obviously some adjustment in the number of guards is necessary in view of changed and changing conditions at the prison. As the Government indicated in its brief (p. 62), "we believe that it may be appropriate for the district court to give defendants an opportunity to prove that a lesser number of officers are needed to provide adequate safety for those confined at Angola." We agree. On remand the District Court should reopen the proceedings for presentation of such relevant evidence as may be required by the parties to update the record and obtain a new ruling.

■ We also approve that part of the District Judge's order requiring the presence of two guards in open dormitories at all times.[7] We have approved this kind of relief in the past; in *Gates v. Collier, supra,* we approved an order which required the posting of three guards in each barracks during nighttime hours. 501 F.2d at 1309. In the present case, Chief of Security Bryan, a defendant, testified as follows:

Q: Col. Bryan, is homosexuality a problem inside the penitentiary?

A: It is, in every penitentiary.

Q: Isn't it in your particular penitentiary?

A: It is.

Q: How severe is this problem inside Angola?

---

7. Appellants "object strenuously to the order of the court to house two officers in each dormitory twenty-four hours a day" despite having stipulated with the Special Master that "[a] correctional officer should be stationed in each dormitory 24 hours a day, 7 days a week, with supervisory correctional officers nearby." Appendix to the Report of the Special Master, para. 45.

A: No worse than any other prison, I would think.

Q: Would you classify it as one of the more serious problems you have?

A: It is.

Q: Are any of the stabbings related to homosexuality?

A: Yes, sir.

Q: What percentage?

A: About fifty percent.

Q: How is it possible for those homosexual acts to occur inside the penitentiary?

A: We have open type dormitories. We do not have officers inside the dormitories at all times.

Another defendant, Deputy Warden Dees, testified:

Q: All right, how many ways do you have in order to prevent them from being in possession of weapons?

A: Very few. The only thing we can do is shake them down, search them periodically.

Q: What would you need at your disposal in order to make the situation better than what it is or what it has been?

A: Well, we can make it better, I guess, but we need more security personnel where you could be constantly searching people, have someone constantly on the scene within the dormitories. That is the only way I know.

This evidence speaks for itself. Appellants have offered no alternative means of improving inmate safety within the dormitories to acceptable levels. "It is the obligation of penitentiary officials to insure that inmates are not subjected to any punishment beyond that which is necessary for the orderly administration of [the prison]." *Gates v. Collier, supra,* 501 F.2d at 1309. Accordingly, the District Judge's order which is based upon the opinion of prison officials and is similar to previous orders which we have affirmed was well within the authority of the District Judge in this case.

 *Use of state fire and sanitation codes.* Appellants complain of the District Judge's "enforcement" of the state fire and health codes by his order. It is true that "constitutional questions do not arise merely because a state prisoner has been treated at variance with state law," *Gates v. Collier, supra,* 501 F.2d at 1302. Such failure to comply with state norms can be "significant," however, in making a finding regarding constitutionality, *id.*

In the past we have affirmed findings of constitutional violations based in part on state code violations; *see Gates v. Collier, supra; Newman v. Alabama, supra.* It is "significant that the current conditions at [the prison] even fail to comply with the state standards, much less constitutional norms." *Gates v. Collier, supra,* 501 F.2d at 1302. State codes reveal to the District Judge the minimum standards by which the state itself proposes to govern itself concerning habitability. Such a standard is a valuable reference for what is minimal for human habitation in the public view, thus serving as an indicator of "evolving notions of decency," *Newman v. Alabama, supra,* 503 F.2d at 1330 n.14; *see Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 596 (1958). State codes also are a valuable index into what levels of decency the public, expressing itself through the Legislature, is prepared to pay for. Therefore, we approve the use of state sanitation and fire codes because in this manner the federal district judge can minimize his intrusion into the details of prison administration, allowing the state's own published standards to govern. The District Judge did not err in making use of the state fire and sanitation codes.

 *Overcrowding.* The appellants complain that the computation by which the District Judge concluded that Angola was overcrowded was based on an unrealistic figure of 80 square feet per inmate. They point out that the Fire Marshal's report, which is in the record, used a figure of 50 square feet per inmate. The record also shows that the prison contains many different kinds of living areas for inmates, de-

signed for widely differing purposes. In its brief (p. 55) the Government states, "We do not argue that 80 square feet per inmate is a constitutionally compelled standard." It is apparent that the District Judge relied on the testimony of Angola Warden Henderson (who no longer holds this position) who said that he recommended a standard of 80 square feet per inmate and said that on that basis Angola could house 2,641 prisoners. The Warden did not otherwise specify how this total figure was arrived at. The District Court then held that the designed capacity at Angola is 2,641 inmates, in keeping with the Warden's testimony. Because it was necessary as the basis for a temporary, emergency order we affirm the District Judge's order forbidding new additions to the inmate population. We do, however, remand this issue for a more complete record and for a recomputation of the proper inmate population at Angola. The functions and characteristics of each building should be taken into account in arriving at the capacity of each. A simple mathematical calculation of total square feet of space divided by a standard of square feet per man may not necessarily be appropriate or practicable. We observe that Warden Henderson also said that the normal size of a cell at the penitentiary was 6 × 8. That is of course a total of 48 square feet.[8] In updating the record defendants should also submit full information as to the additional inmate facilities now under construction or completed at Angola as a result of the state's building program there. When the acceptable inmate population figure is thus arrived at the District Judge should reconsider his emergency order forbidding additions to the inmate population. This should be done as soon as possible in order to alleviate the backup of prisoners in parish jails and other forwarding institutions. The parties should be allowed full opportunity to submit all necessary and relevant proof on this issue after which a new ruling by the District Court will be proper.

*The unconstitutional level of medical care.* Appellants contend that the "medical care delivery system," while admittedly deficient, is not so deficient as to amount to cruel and unusual punishment. The District Judge adopted the Special Master's determination that deficiencies in medical facilities and treatment at Angola violated both the eighth amendment and the due process clause of the fourteenth amendment.

Just where a deficiency reaches eighth amendment dimensions is difficult to determine, particularly in light of the policy of federal courts in dealing with prison administration. We have said, however, that prison authorities "abuse their discretion" in the treatment of inmates when the prison reflects

> conditions that threaten their physical health and safety and deprive them of basic hygiene and medical treatment by reason of gross deficiencies in plant, equipment and medical staff . . . ..

*Gates v. Collier, supra,* 501 F.2d at 1303. In another case we said:

> Under the cruel and unusual punishment clause of the eighth amendment, courts confine their inquiry *inter alia* to whether conditions of confinement "shock the conscience," are greatly disproportionate to the offense, or offend evolving notions of decency.

*Newman v. Alabama, supra,* 503 F.2d at 1330 n.14. Regarding the due process clause of the fourteenth amendment we have said that courts

> are tolerant of some mishaps and require only that "under the totality of the circumstances, adequate medical treatment be administered when and where there is reason to believe it is needed."

*Id.* In *Newman* this Court found that the totality of circumstances concerning medical care deprived prisoners of their rights under the eighth and fourteenth amendments, on a showing

> generally accepted correctional standards require a minimum of 50 square feet of living area for every prison inmate."

---

**8.** In *Gates v. Collier,* N.D.Miss., 1975, 390 F.Supp. 482, 486, District Judge Keady held, "We know from the undisputed evidence that

of evidence of rampant and not isolated deficiencies which due to callous indifference subject inmates to the severe deprivations chronicled in the record below. The "deprivations" shown by the record in *Newman* included "insufficient staffing" resulting in, for example, inmate assistants administering treatment and medication, taking x-rays, giving injections and performing suturing and minor surgery; unsanitary conditions; shortages of medical supplies; ill-serviced and substandard equipment; the absence of ambulances; delays in effecting medical referrals to facilities equipped to deal with them; delays in filling requests for eyeglasses and prosthetic devices; and lack of adequate facilities for geriatrics and for the mentally disturbed. *Newman v. Alabama, supra,* 503 F.2d at 1323–24.

Concerning the medical care delivery system at Angola, the Special Master concluded that "[t]he defendants have failed to provide the inmates with proper medical care and treatment by professionally qualified and trained medical personnel using adequate medical facilities, equipment and supplies." The parties stipulated that the Angola General Hospital, the major medical unit serving the prison,

> is not accredited by the Joint Commission on Hospital Accreditation and does not meet the Conditions for Participation of Hospitals of the United States Department of Health, Education and Welfare. The hospital is understaffed and has often been operated for extended periods without the services of a resident physician.

> . . . . .

> Of those persons who were employed at the hospital and on its medical staff only two were licensed to practice in the State of Louisiana and no person on the medical staff was licensed to practice in another state.

Inmates filled the following positions at the hospital: emergency room attendant; x-ray attendant; physician's assistant; laboratory assistant; leutics and physical therapy assistant; eye, ear, nose and throat clinic assistant; ambulance driver; sick-call assistant; nurse; dental assistant; dental lab assistant; consulting clinic assistant; operating room technician; prescription clerk; medical records clerk; hospital diet cook; security clerk. The parties further stipulated that

> approximately two-thirds of these inmates have attained an educational level no higher than the eighth grade. None of the inmates assigned duties which involve the delivery of medical care have had any formal medical training or any significant medically related employment experience. Of those inmates who are assigned nursing duties almost half of them have a fifth grade education or lower. Only one inmate assigned as a nurse has had more than nine years of formal education and this inmate is not a high school graduate. One inmate who works as a nurse can barely read or write. The hospital administrator, therefore, has assigned him an assistant.

The record also reflects that at the time of trial there were no registered nurses at the hospital.

The parties stipulated that the clinical laboratory enjoys the services of neither a consulting pathologist nor of a quality control service. Test records are neither maintained at the lab nor recorded in patients' medical records. No written organizational plan or policies or procedures concerning test procedures, safety procedures or equipment quality control exist. No records, reports or statistical information are maintained. The equipment is not adequately calibrated.

The parties stipulated that the x-ray is operated by "a self-trained inmate hospital worker who has an inmate assistant." There is no adequate supervision of the department.

The parties stipulated that the pharmacist is neither licensed nor academically trained as a pharmacist. The pharmacy has no written organizational plan or procedures. Control of needles and syringes is inadequate in the pharmacy and hospital. The pharmacy contains outdated drugs and

has no system of keeping supplies up to date. During the 16 hours daily when the pharmacist is off duty inmate assistants have unsupervised access to the pharmacy and dispense medications. Controlled medications, including narcotics, prescribed for out-patient inmates at remote areas of the penitentiary are administered by security officers who have refused to sign receipts for the drugs. No records of this dispensing are kept. There is no record or notification to the medical staff of adverse drug reactions. "Some inmates, in fact, do not receive the medication which has been prescribed and ordered for them." The record reflects that inmates have been known to sell their prescribed drugs to other inmates.

The parties stipulated that the dental clinic has not been inspected or accredited by the American Dental Association. It lacks a written organizational plan or statement of policies. "Only those inmates who raise dental complaints are examined. There is no regular or periodic dental exam. The dental department does not maintain records of those inmates it does examine."

The parties stipulated that the surgical suite is "rapidly deteriorating and its equipment has become obsolete and/or inoperative." Most surgery is performed by agreement at Charity Hospital in New Orleans and Earl K. Long Hospital in Baton Rouge. Because of the limited space available to prisoners at these hospitals "inmates in need of surgery must wait five to six months. In some instances, Charity Hospital has refused to receive and admit inmates." The stipulation continues,

In the past a surgeon visited the hospital on a regular schedule and performed surgery. However, due to the lack of equipment and the lack of a qualified medical staff to assist and to provide post-operative care, he declined to perform further surgery at the hospital.

When examined by a medical survey team the emergency department equipment was described as "filthy." The record reflects unsupervised inmate staff applying casts to broken bones, suturing wounds and performing other technical tasks for which the parties stipulated that they were unqualified.

The parties stipulated that at the time of the testimony of the hospital administrator at trial "sick call had not been conducted at [certain remote] locations for three weeks."

The stipulation continues,

The hospital's diet kitchen is not properly equipped. The inmate cooks lack the expertise and do not have the guidance to enable them to prepare a diet which conforms to a patient's medical and nutritional needs. When inspected by the medical survey team, the sanitation of the kitchen was deplorable.

A member of the medical survey team discovered that one of the two pieces of equipment in the physical therapy department, a whirlpool bath, was inhabited by fish being kept fresh prior to being eaten. The inmate in charge of this department prescribes, administers and makes records of treatment without supervision despite lacking any training for his duties or any education beyond tenth grade. Testimony in the record reflects that this inmate performs blood tests for syphilis and administers "penicillin type products personally," and that these are normally the functions of a physician.

The parties stipulated that

The accuracy and confidentiality of the doctor-patient relationship and of the medical records is violated. Portions of the medical records have been purchased and stolen. Not only do inmates have access to the medical records, but those persons working in the medical records department do not have the authority to prevent security personnel from examining an inmate's medical record.

The parties stipulated that there is no psychiatric unit, although "Approximately 40% of the inmate population, or 1,360 inmates, would benefit from psychiatric treatment." An area of the cell block is used to house those for whom in-patient psychiatric care would be appropriate. Those confined to the cell block are under supervision of correctional officers who

have no medical training. "No notes, medical records or observations of the inmates confined to the psychiatric unit are recorded." The parties conclude this stipulation saying "The psychiatric unit is totally inappropriate for the confinement of a psychiatric patient."

Testimony in the record indicates that some inmate patients are kept in locked rooms not equipped with nurse call and to which hospital aides have no keys.

The District Judge did not err in determining that the medical care at Angola deprived the inmates of constitutional rights.

*The long-range plan.* Appellants argue that it is burdensome to comply with the District Judge's order to submit a detailed long-range plan for constitutional operation of the prison, within 180 days. The purpose of the plan is to allow the appellants and the state the kind of self-determination for which they repeatedly argue in their briefs. We affirmed such an order in *Gates v. Collier, supra.*

Pursuant to our request appellants have supplied the court with the detail of funds appropriated by the Louisiana Legislature for prison reform in the state. A total of $106,605,000 for capital outlay funds was appropriated by Act 10 of the 2d Extraordinary Session of 1976 of the Louisiana Legislature. Provisions were made for construction of numerous new facilities to house inmates, and the estimated completion dates are shown. For example, two dormitories are set for construction at the Adult Correctional Facility at DeQuincy for first offenders providing 200 beds. A new facility to house 315 adult offenders for the Correctional Services Treatment Unit, the newly created center for psychiatric care and evaluation in New Orleans, is provided. At St. Gabriel construction of a new facility to house 1,000 adult offenders is provided for. At Angola a total of $30,000,000 has been authorized and will provide a Camp C 500 inmate capacity, at Camp D 500 inmate capacity, and at Camp J 200 inmate capacity. Camps C and D were scheduled for completion in February 1977 and Camp J

for March 1977. Completion has been delayed, we have been informed, by bad weather but in a matter of months construction should be completed.

At Camp Beauregard a new facility for 250 work release and maintenance inmates has been authorized. At Claiborne Parish a new facility for 535 adult offenders is provided. At Dixon Correctional Institution in East Feliciana Parish, renovation will house 760 adult offenders. A complete statement of Supplemental Operating Funds of the State of Louisiana for the prisons referred to, including Angola, is shown on Exhibit A attached, which was supplied to the Court by the Attorney General of Louisiana in his supplemental brief filed January 17, 1977. It is clear that Louisiana is finally facing up to its responsibility for providing proper facilities for its criminal population. It is apparent that had it not been for the strong and determined efforts of District Judge Gordon West, the Louisiana federal trial judge in this case who ordered a cleanup of the deplorable conditions at Angola, Louisiana officials might still be talking about prison reform instead of taking the remedial action which the large appropriation of funds now indicates.

*Conclusion.* Though we emphasize the policy of minimum intrusion into the details of state prison administration, when constitutional violations of rights of individuals, even prison inmates, are brought to our attention, we are bound to redress them. The scope of our authority to correct these conditions is as broad as the violations proven, striving where possible to permit self-determination to prison officials. That conditions of confinement for inmates at Angola have been terrible has been admitted by defendant Louisiana officials. Our interference in the affairs of Angola was inevitable; in fact, it was required by the Constitution. The requirements set for constitutional operation of Angola are as unobtrusive as possible under the circumstances; they do not exceed what we have affirmed previously in similar circumstances in other prison cases.

Thus the District Court did not exceed its authority herein, and the eleventh amendment does not bar the relief he granted. We therefore affirm the decision of District Judge West that the totality of conditions at Angola violated the eighth amendment, and specifically that the level of medical care at Angola violated the eighth and fourteenth amendments. We likewise affirm the relief ordered by the District Court. We remand for further determination as soon as possible, the proper figure for inmate population and for the number of prison guards necessary to insure safety at the Angola Penitentiary.[9] We also affirm the remainder of the District Court's order.

AFFIRMED; REMANDED FOR FURTHER PROCEEDINGS.

EXHIBIT "A"

SUPPLEMENTAL OPERATING FUNDS: FCO 71–98 COMPLIANCE

FY75–76

| UNIT | AMOUNT | SOURCE | COMMENTS |
|---|---|---|---|
| (A) HDQ (10–01) | $ 1,373,113 | Interim Emergence Board | Provided monetary support for compliance efforts at HDQ, LSP, DCI, & CSTU |
| (B) HDQ (10–01) | 1,341,044 | ACT 2 – 1976 | Provided monetary support for compliance efforts at HDQ, LSP, DCI, & CSTU |
| (C) LSP(10–03) | 1,736,467 | ACT 2 – 1976 | Provided monetary support for compliance efforts at LSP and Greenwell Springs Hospital. |
| TOTAL: | 4,450,624 | FY 75–76 | |

FY 76–77

| UNIT | AMOUNT | SOURCE | COMMENTS |
|---|---|---|---|
| (A) HDQ | 4,951,951 | ACT 17 – 1976 | 90% of increase in Hdq. budget from FY 75–76; (net of LSP, DCI, & CSTU), to FY 76–77 |
| (B) LSP | 3,546,550 | ACT 17 – 1976 | 90% of increase in LSP Budget from FY 75–76 to FY 76–77, (net of CSTU) |
| (C) DCI | 4,299,019 | ACT 17 – 1976 | FY 76–77 appropriation |
| (D) CSTU | 475,000 | ACT 17 – 1976 | FY 76–77 appropriation (est. for Administration & Operation of the Psychiatric Program at CSTU. |
| (E) LCIS | 760,824 | ACT 17 – 1976 | 90% of increase in LCIS Budget from actual 75–76 to estimated 76–77, (contingent on completion of two new 100 man dorms). |

9. We specifically direct the District Judge's attention to the overcrowded conditions at the Orleans Parish and Washington Parish prisons of which we take cognizance because there are pending before us appeals in the two matters involving these prisons, namely, *Howard v. Phelps,* No. 77–1227, and *Hamilton v. Gates,* No. 77–1228, in which this Court has been requested to stay orders of District Judge Mitchell in the *Hamilton* case and of District Judge Cassibry in the *Howard* case. These are pressing matters insofar as the court is concerned and the District Judge herein should attempt to alleviate these conditions at the earliest possible time.

| | | | |
|---|---|---|---|
| (F) HDQ | 215,821 | Accelerated Spending | |
| (G) LSP | 4,088,506 | Accelerated Spending | In accordance with Louisiana Department of Corrections expansion due to FCO 71–98 clarification. |
| (H) DCI | 93,951 | Accelerated Spending | |
| TOTAL | $18,431,622 | FY 76–77 | |

## SUPPLEMENTAL CAPITAL OUTLAY FUNDS: FCO 71–98 COMPLIANCE

FY 76–77

| UNIT | AMOUNT | SOURCE | COMMENTS |
|---|---|---|---|
| (A) LA Dept. of Highways | $ 19,840,000 | ACT 10 – Second Extraordinary Session – 1976 | Development of improved access to LSP in West Feliciana and Point Coupe Parishes. Estimated completion date: July 1981 |
| (B) LCIS | 955,000 | ACT 10 | Construction of Two Dormitories to increase capacity of LCIS by 200 beds. Estimated completion date: October 1977 |
| (C) CSTU | 6,000,000 | ACT 10 | Construction of a new facility to house 315 Adult Offenders in the Work Release, Maintenance and Special Treatment Programs. Estimated completion date: February 1978 |
| (D) ARDC St. Gabriel | 23,990,000 | ACT 10 | Construction of a new facility to house 1000 adult offenders. Estimated completion date: February 1979 |
| (E) LSP | 30,755,000 | ACT 10 | Breakdown as follows: (1) $2,342,000 electrical distribution system (2) 3,269,187 Internal road sys. improvements (3) 6,830,000 Camp C—approx. capacity; 500—estimated completion date: 2/77 (4) 6,682,000 Camp D—approx. capacity; 500—estimated completion date: 2/77 (5) 6,585,742 Camp J approx. capacity; 200—estimated completion: 3/77 (6) 620,000 Camp F renovation (7) 1,500,000 New prison dining hall—construction (8) 2,926,071 Fees & contingency |

| | | | |
|---|---|---|---|
| (F) Camp Beauregard | 2,435,000 | ACT 10 | Construction of a new facility to house approximately 250 Work-Release & Maintenance inmates. Estimated completion date: August 1978 |
| (G) Claiborne Parish | 15,000,000 | ACT 10 | Construction of a new facility to house approximately 535 adult offenders. Estimated completion date not scheduled. |
| (H) DCI | 6,630,000 | ACT 10 | Renovation of colonies 6, 7, & 9 at Louisiana State Hospital to house 760 adult offenders. Colonies 6 & 7 completed & occupied. |
| TOTAL | 105,605,000 | | |

Note by the Court:

According to the supplemental brief of the Attorney General of Louisiana (pp. 6–7) (filed January 17, 1977), "It is necessary to define some of the abreviations [sic] used to facilitate the Court's review of this schedule. FCO 71–98 stands for 'Federal Court Order Docket No. 71–98 in the Middle District of Louisiana'; HDQ stands for 'Headquarters'; LSP stands for 'Louisiana State Penitentiary'; DCI stands for 'Dixon Correctional Institute' (a facility recently established in East Feliciana Parish as a direct response to the September 5, 1975 order to reduce the population at Angola); CSTU stands for 'Correctional Services Treatment Unit' (the newly created center for psychiatric care and evaluation in New Orleans created especially in response to the Court order relating to medical treatment); LCIS refers to the Adult Correctional facility at DeQuincy, Louisiana for first offenders; the comments under the source column for items F, G, and H on page 1 of 'Accelerated Spending' refers [sic] to the fact that the monies indicated were already in the budget but have been spent faster than anticipated since the October clarification order of the lower Court. The categories from which these funds came will hopefully be replenished by the Legislature when it meets in April. Page 2 reflects the additional funds for capitol [sic] improvements associated with the compliance. The only new abreviation [sic] is item D of ARDC which stands for 'Adult Reception and Diagnostic Center'. With the exception of item A and C, all of the programs are under contract and in process."