**N. H. NEWMAN et al.,
Plaintiffs-Appellees,**

**v.**

**STATE OF ALABAMA et al.,
Defendants-Appellants.**

**Jerry Lee PUGH, for himself and others similarly situated, Plaintiffs-Appellees,**

**v.**

**Judson C. LOCKE, Jr. and State of Alabama, et al., Defendants-Appellants.**

**Worley JAMES et al.,
Plaintiffs-Appellees,**

**v.**

**George C. WALLACE et al.,
Defendants-Appellants.**

No. 76–2269.

United States Court of Appeals, Fifth Circuit.

Sept. 16, 1977.

Rehearing and Rehearing En Banc Denied Nov. 7, 1977.

William J. Baxley, Atty. Gen., George Beck, Larry R. Newman, Asst. Attys. Gen., Robert S. Lamar, Jr., Montgomery, Ala., for Locke, et al., and State of Alabama, et al.

W. Scears Barnes, Jr., Alexander City, Ala., for Locke and all Board Members.

Thomas S. Lawson, Jr., William K. Martin, Montgomery, Ala., for Wallace, et al.

John C. Hoyle, Atty., Dept. of Justice, Civil Rights Div., Washington, D.C., for amicus, U.S.A.

Joseph D. Phelps (court-appointed not under Act), Montgomery, Ala., for Newman, et al.

Robert D. Segall (Court-Appointed not under Act), Joseph J. Levin, Jr., Montgomery, Ala., for Pugh, et al.

George Peach Taylor (Court-Appointed not under Act), University, Ala., for James, et al.

Alvin J. Bronstein, The National Prison Project, Matthew L. Myers, Washington, D. C., for National Prison Project, amicus curiae.

Walter W. Barnett, Stephen A. Whinston, Atty., Depart. of Justice, Washington, D.C., for the United States, amicus curiae.

Before COLEMAN, Circuit Judge, KUNZIG *, Judge, and GEE, Circuit Judge.

COLEMAN, Circuit Judge.

■ The Eighth Amendment to the Constitution of the United States, reinforced by the Fourteenth Amendment, prohibits the imposition of cruel and unusual punishment. It is much too late in the day for states and prison authorities to think that they may withhold from prisoners the basic necessities of life, which include reasonably adequate food, clothing, shelter, sanitation, and necessary medical attention, *Gates v. Collier*, 5 Cir., 1974, 501 F.2d 1291; *Newman v. Alabama*, 5 Cir., 1974, 503 F.2d 1320, cert. denied 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102; *Williams v. Edwards*, 5 Cir., 1977, 547 F.2d 1206.

■ It should not need repeating that compliance with constitutional standards may not be frustrated by legislative inaction or failure to provide the necessary funds, *Gates v. Collier, supra*, at 1319; *Smith v. Sullivan*, 5 Cir., 1977, 553 F.2d 373.

■ On the other hand, lawful incarceration necessitates withdrawal of or limitations upon many individual privileges and rights. A prisoner does not retain constitutional rights that are inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Wide ranging deference must be accorded the decisions of prison administrators. They, and not the courts, must be permitted to make difficult judgments concerning prison operations, *Jones v. North Carolina Prisoners' Labor Union, Inc.* [1977], —— U.S. ——, 97 S.Ct. 2532, 53 L.Ed.2d 629. In his concurring opinion in *Jones*, Mr. Chief Justice Berger wrote that in penal matters the federal courts may not "second guess" legislatures and prison administrators except in the most extraordinary circumstances.

The present case is somewhat similar to *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561. There petitioners claimed that the judgment of the District Court represented an unwarranted intrusion by the federal judiciary into the discretionary authority committed to them by state and local law to perform their official functions. The Supreme Court found itself "substantially in agreement with th(o)se claims", at 366, 96 S.Ct. at 602. The case involved an "assertedly pervasive pattern of illegal and unconstitutional mistreatment by police officers".

The Supreme Court said,

"Where, as here, the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and state administration of its own law'. * * * Even in an action between private individuals, it has long been held that an injunction is 'to be used sparingly, and only in a clear and plain case'."

* Judge of the United States Court of Claims, sitting by designation.

The Court concluded that when the District Court injected itself into the internal disciplinary affairs of the Philadelphia Police Department, a state agency, it had departed from the controlling precepts of federalism in determining the availability and scope of equitable relief. The judgment of the Court of Appeals affirming the decree of the District Court which directed the imposition of a comprehensive program for dealing adequately with civilian complaints was reversed.

This does not mean that Constitutional standards are not to be scrupulously observed or that the statutes designed to enforce that objective are to be denied full effect. It does mean in the prison context that federal courts should keep their eyes on the main objective, the Eighth Amendment command for the eradication of cruel and unusual punishment. The remedy must be designed to accomplish that goal, not to exercise judicial power for the attainment of what we as individuals might like to see accomplished in the way of ideal prison conditions. There are those who would argue that imprisonment in any form is cruel and unusual. The Amendment, however, recognizes the right to punish for criminal conduct as long as that punishment does not escalate to the cruel and unusual.

For example, we have held that visitation privileges are matters subject to the discretion of prison officials, *McCray v. Sullivan*, 5 Cir., 1975, 509 F.2d 1332, 1334.

Failure of prison authorities to provide a rehabilitation program does not by itself constitute cruel and unusual punishment, *Ibid*, at 1335.

■ Federal courts are extremely reluctant to limit the freedom of prison officials to classify prisoners as they, in their broad discretion, may deem appropriate, *Ibid*, at 1334; *Young v. Wainwright*, 5 Cir., 1971, 449 F.2d 338.

State penitentiaries are occupied by convicted felons, either ineligible for or found to be unworthy of probation. By its very nature, the operation of such a prison is a dangerous undertaking. Time and time again, experience has dramatically taught that the management and control of prisons, the prevention of mass violence within prisons, and the safe retention of convicts within prison walls, present problems of the first magnitude, in which failures occur all too often, as recently demonstrated at Brushy Mountain, Tennessee. There was intense nationwide interest when a notorious prisoner escaped but not much concern had previously been shown for the problems of prison officials in trying to hold him inside the walls.

■ The authority to manage and control a felony prison should never be unduly restricted or divided. That authority must repose in one well identified place, limited only by the requirements of the law.

I

This appeal is concerned with the remedies prescribed by the very able District Court for the eradication of cruel and unusual punishment in the Alabama State Prison System, *Pugh v. Locke*, 406 F.Supp. 318 (M.D.Ala., 1976). At the federal level this involves a comparatively new field of the law. It was not until 1962 that the Supreme Court applied the Eighth Amendment ban to the states through the Fourteenth Amendment, *Robinson v. State of California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758.

The State concedes that the evidence established excessive overcrowding in these prisons, that there were not sufficient guards to reasonably protect the inmates from one another, and that the overcrowding was primarily responsible for and exacerbated all the other ills of the penal system. As detailed in its published opinion, other indefensible conditions were found by the District Court, findings clearly supported by the evidence.

At the outset, then, the case is reduced to a constitutional appraisal of the remedies required of the State. The State contends that in fashioning those remedies the District Court "exceeded its judicial power and abused its discretion".

■ Our first response is that the determined efforts of the highly dedicated District Judge to put an end to unconstitutional conditions in the Alabama prison system merit high commendation. We cannot believe that the good people of a great state approved the prison situation demonstrated by the evidence in this case. We note, too, that for more than a year funds for an entirely new prison have been available as the result of legislative action, which is likewise commended. A state has no higher duty than the preservation of its governmental integrity by the enforcement of its own laws, which inescapably includes the maintenance of an effective state prison system. This Court expresses the hope that the difficulties encountered in naming a location for the new prison will be speedily resolved.

■ Our real issue is whether in striving to attain constitutional objectives the District Court in a few respects went impermissibly beyond the requirements of the federal constitution; more specifically, did the Court supersede the duly constituted state authorities in the performance of vital state functions rather than *compelling* those authorities to perform those functions in a constitutional manner? We all understand, of course, that federal courts have no authority to address state officials out of office or to fire state employees or to take over the performance of their functions. Most assuredly, however, in proper cases a federal court can, and must, compel state officials or employees to perform their official duties in compliance with the Constitution of the United States.

■ At the outset we hold that the steps taken by the District Court to ensure reasonably adequate food, clothing, shelter, sanitation, necessary medical attention, and personal safety for the prisoners were within its sound discretion and will not be disturbed on appeal. Some of the steps in regard to these matters, if considered in isolation, may have gone beyond constitutional mandates but they were justifiably invoked for the eradication of Eighth Amendment conditions. We do not pause

to discuss a number of state contentions which are foreclosed by our opinion in *Williams v. Edwards*, 5 Cir., 1977, 547 F.2d 1206, decided after this appeal was filed and briefed.

There are a few features of the case, however, in which we are of the opinion that less intrusive, but equally effective, measures should have been taken by the District Court. An adjustment of these matters within constitutional bounds should not hamper or impede the attainment of an effective, constitutionally operated state penal system. As to these matters, we think some modifications are in order. With those modifications, the judgment of the District Court will be affirmed and the case remanded for further proceedings not inconsistent herewith.

## II

■ Unless intended to apply only to existing facilities we do not discern the constitutional basis for the requirement that Alabama state prisoners shall be housed in individual cells, nor can we agree that "design" standards, *without more*, amount to a *per se* constitutional limitation on the number of prisoners which may be housed in a particular prison facility. Those who design prisons are not vested with either the duty or the power to prescribe constitutional standards as to prison space. Assuming that the District Court intended these limitations to apply only to presently existing prisons and not to those hereafter to be constructed the judgment in these respects is affirmed.

The Court required that all new prison construction should provide sixty square feet of space per prisoner. We remand this requirement to the District Court for further consideration in the light of our opinion in *Williams v. Edwards*, 547 F.2d, at 1215.

## III

The District Court established and appointed a "Human Rights Committee", composed of 39 individuals. Whether they

were qualified by training or experience in the operation of a state prison system is not shown. At State expense, the Committee was authorized to employ a fulltime staff consultant, other specialists, and a fulltime clerk-stenographer. The Committee members were to be compensated at the same rate as that paid the Alabama State Board of Corrections.

The Committee was authorized to monitor implementation of the standards prescribed by the Court's decree as well as those prescribed in *Newman v. Alabama*.[1] The Order provided that

"[T]he Committee may at reasonable times inspect the state prison facilities, interview inmates, and inspect institutional records. The Committee shall review plans for implementation of this decree to ensure that they comport with minimum standards set forth. . . .. The Committee shall be authorized to take *any action* [emphasis added] reasonably necessary to accomplish its function."

Our initial reaction is that "reviewing plans for implementation of this decree to ensure that they comport with minimum standards set forth" could more properly have been assigned to the magistrate or to a master, qualified to hold hearings, make findings of fact, and report to the Court for its approval or disapproval. Moreover, the authority to "*take any action*", with no accompanying standards or limitations, could amount, in practical effect, to turning the administration of the prisons over to the Committee, as, in some respects, appears to have occurred.

It may be that in setting up the Committee the Court had in mind the appointment of numerous biracial committees in school desegregation cases. The analogy is not altogether inapposite but we are not aware of any school desegregation decree in this Circuit which authorized such committees to do more than assemble information, confer, advise, and make representations to the school board and the court. They did not participate in "day to day" school operations, they received no compensation, and their function did not have either the appearance or the effect of superseding school boards or faculties in the daily administration of the school systems. Additionally, the circumstances surrounding the operation of schools are quite different to those prevailing in the operation of a penitentiary.

The State asserts, and it is not disputed, that in a number of instances prison authorities and their counsel were *not* notified of meetings between committee members and the District Court with reference to prison operations; therefore, state counsel were unable to participate or to be heard.

The State further asserts that the Committee impermissibly interfered with the Alabama Board of Corrections and its duly authorized agents in the exercise of powers and duties exclusively conferred upon them by Alabama law.

We have examined numerous letters appearing in the printed Appendix, signed by the Chairman of the 39 member Committee, addressed to the Alabama Board of Corrections or its agent, in which the addressees were directed to take specified action in regard to certain matters. These letters state that they were written at the direction of the District Court.

From the record, we are left with the firm conviction that the Committee undoubtedly did impermissibly intrude, and had every appearance of impermissibly intruding, upon functions properly belonging to the daily operation of the Alabama prison system. Prison officials cannot be expected to perform in an efficient or an effective manner if they are required to stay in line with so numerous a Committee, at the same time constantly confronted with the spectre of federal contempt of court.

1. D.C., 349 F.Supp. 278, *affirmed in part*, 5 Cir., 1974, 503 F.2d 1320, *cert. denied* 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102.

 This is not to say that the District Court could not take and should not have taken appropriate steps to ensure compliance with its remedial decree. We think, however, that a more reasonable, less intrusive, more effective approach would have been to name one monitor for each of the prisons involved, with full authority to *observe*, and to report his *observations* to the Court, with no authority to intervene in daily prison operations.

The use of a single monitor was the approach, not disapproved by this Court, in *Gates v. Collier, supra.*

The oversight of the proposed monitors might well be placed in the hands of a magistrate or a master, who could deal with alleged, but disputed, non-compliance in findings of fact and conclusions of law, subject to the ultimate decision of the District Judge, where appropriate.

By the single monitor method, the prison authorities will be diverted from the execution of their duties to the extent of conferring and cooperating with only one court-authorized individual. As a matter of fact, informal conferences between the warden and only one individual holding a charter from the Court would likely put an end to many problems without any necessity for further reference.

Such a monitor should be a person of undeniable qualifications, carefully chosen, hopefully with experience in the operation of a state or federal prison system which has not been in litigation over failure to abide by the Constitution.

Upon remand, and no later than thirty days from the receipt of our mandate, the District Court should dissolve the 39 member Committee and its functions should be terminated. The Court should name a monitor for each of the prisons which are the subject of the remedial decree. The guidelines for the monitors, and the duties of the prison authorities as to their cooperation with those monitors, should be specifically spelled out by an appropriate order so that

none of those involved will suffer any reasonable doubt as to what is required of both monitors and prison officials.[2]

When so appointed, and their functions defined, the monitors may be paid reasonable compensation, consistently with their qualifications and experience, to be recovered from the State of Alabama as a part of the reasonable costs of this litigation.

Since the order appointing the 39 member Committee was not void *ab initio* the compensation and expense of its members and staff as heretofore fixed by the District Court will stand undisturbed, to be paid by the State as a part of the costs of this critically important litigation.

## IV

Appellants complain vigorously of the actions of the District Court in assigning a major role in the classification of prisoners to the Prison Classification Project of the University of Alabama. In response to an inquiry propounded by this Court through appropriate judicial channels we are now in possession of an order entered by the District Court on July 19, 1977, in which the Court adjudged that the University of Alabama group is no longer functioning insofar as these cases are concerned. That being true, we find this aspect of the appeal to be moot. We make no comment thereon except to say that we understand the classification of prisons in the Alabama prison system will hereafter proceed under the control and direction of the duly constituted Alabama prison authorities, with no interference or participation by any outside group, saving, of course, the right of the District Court by appropriate measures, if needed, to see to it that constitutionally required classification standards, if any, are observed by the prison authorities in the exercise of a function which is fundamentally theirs, *McCray v. Sullivan*, 5 Cir., 1975, 509 F.2d 1332.

2. It may be that one monitor could adequately take care of more than one prison. If so, the District Court may act accordingly.

## V

■ Failure of prison authorities to provide a rehabilitation program, by itself, does not constitute cruel and unusual punishment, *McCray v. Sullivan*, 5 Cir., 1975, 509 F.2d 1332, 1335.

■ Amicus Curiae, the United States, concedes that there is no constitutional right to rehabilitation for prisoners. It does proceed to argue, however, that "states have a duty to insure that the mental, physical, and emotional status of prisoners in their custody do not deteriorate". On the face of it, this is not a well considered statement. The mental, physical, and emotional status of individuals, whether in or out of custody, do deteriorate and there is no power on earth to prevent it. We think that what the government must have meant is that states may not inflict cruel and unusual punishment that would likely lead to such results. The briefs for the parties plaintiff and for the State of Alabama deal with this idea to considerable length. We decline to enter this uncharted bog. If the State furnishes its prisoners with reasonably adequate food, clothing, shelter, sanitation, medical care, and personal safety, so as to avoid the imposition of cruel and unusual punishment, that ends its obligations under Amendment Eight. The Constitution does not require that prisoners, as individuals or as a group, be provided with any and every amenity which some person may think is needed to avoid mental, physical, and emotional deterioration.

Even so, on the facts of this case, we affirm the actions of the District Court designed to provide Alabama prison inmates with reasonable recreational facilities. We do this simply because such facilities may play an important role in extirpating the effects of the conditions which undisputably prevailed in these prisons at the time the District Court entered its order.

## VI

■ The District Court directed that inmates should be allowed to receive visitors on at least a weekly basis. Under our decision in *McCray v. Sullivan*, we feel that visitation regulations should be left to. the prison authorities, wisely adapted to individual circumstances if their sound discretion should so dictate, or included in general rules which will allow prisoners reasonable visitation.

■ The Court further directed that visitors should not be "subjected to any unreasonable searches". Of course, no citizen not a prisoner may be subjected to unreasonable searches. Even so, within a prison the prime consideration is the preservation of the safety and security of the prison, including the exclusion of contraband. Prison authorities have both the right and the duty by all reasonable means to see to it that visitors are not smuggling weapons or other objects which could be used in an effort to escape or to harm other prisoners. They have a duty to intercept narcotics and other harmful contraband. This is no more an intrusion on the rights of visitors than the requirement that persons about to board commercial aircraft shall have their persons and baggage electronically searched for the purpose of determining that they are not carrying weapons, *United States v. Cyzewski*, 5 Cir., 1973, 484 F.2d 509, *cert. denied*, 415 U.S. 902, 94 S.Ct. 936, 39 L.Ed.2d 459. That which would be unreasonable in the outside world may be indispensable within a prison.

Additionally, we conclude that prison authorities should not be required to maintain prison security with one eye on the subject and the other on the consequences of contempt, in which the District Court could convert a warden into prisoner. If abuses actually exist, there are other remedies less likely to interfere with the ongoing safety of the prison.

Upon remand the District Court should eliminate this item from its decree, reserving the right to take the necessary action with reference to actual abuses if they persist to an extent justifying injunctive relief.

## VII

The injunction included the Governor of Alabama. Our examination of the record

indicates that he has no hand in the operations of the Alabama penal system beyond the customary budget recommendations to the legislature and the appointment of the Alabama Board of Corrections. The statute vests all power and control in the Board. Upon remand, the District Court should dissolve the injunction entered against the Governor. The same action should be taken as to those members of the Board and other prison officials who are no longer in office and thus have no further responsibility for the implementation of the Court decree. To the extent herein approved, the injunction will, of course, remain in full force and effect as to those actually running the system until such time as it may be shown in the District Court that the prisons are being operated in a constitutional manner. That the Court should remove itself from prison operations at the earliest date consistent with the vindication of constitutional rights is no doubt well known to the District Court.

### VIII

■ The District Court directed that each prisoner shall be assigned to a meaningful job on the basis of his or her abilities and interests, and according to institutional needs. While there is no federal constitutional mandate for this proviso, as phrased it should not impose any real burden on the penitentiary authorities, so, in the context of this case we allow it to stand, not, however, to enjoy any precedential status in future cases if they should arise.

■ We interpret those portions of the Order dealing with opportunities to obtain a basic education, to attend vocational school, and to attend a transitional program prior to release as meaning that if the prison authorities operate such programs each prisoner shall have impartially equal access on an objective standard of basic utility to the individual. We would find it difficult to hold, and we do not now hold, that if the state has no such programs it amounts to cruel and unusual punishment within the prohibitions of the Eighth Amendment. As a matter of fact, in the operation of a good prison system, we understand that such programs are fairly standard practices, instituted and operated on the initiative of state prison authorities.

### Conclusion

With the modifications herein enumerated, the judgment of the District Court is affirmed. The case is remanded for further proceedings consistent herewith and for such other and further action as the District Court, pending the termination of this litigation, may find it necessary to take for the vindication of Eighth Amendment rights.

AFFIRMED and REMANDED.