Joseph TAYLOR et al.,
Plaintiffs-Appellees,

v.

W. L. STERRETT et al., Defendants,

Judge John Whittington et al.,
Cross-Claimants-Appellants,

Oak Lawn Preservation Society, etc., et al., Cross-Defendants.

No. 77-2241.

United States Court of Appeals,
Fifth Circuit.

Aug. 16, 1979.

**1136**

Earl Luna, Dallas, Tex., for defendants.

John F. Jordan, Dallas, Tex., for plaintiffs-appellees.

Before WISDOM, AINSWORTH and RONEY, Circuit Judges.

AINSWORTH, Circuit Judge:

The Commissioners Court of Dallas County, Texas ("County") appeals two orders of the district court requiring modifications in the facilities and operating procedures of the County jail system. These orders are the latest stage in prolonged litigation involving conditions in the Dallas County jails.[1] We vacate the orders, along with all other orders and stays still in effect, and remand with directions to the district court to discontinue further exercise of its retained jurisdiction and to dismiss the cause.

*I. Background*

This case began on October 26, 1971, when four inmates of the Dallas County Jail filed a class action suit alleging that they and other prisoners were being subjected to cruel and unusual punishment and otherwise deprived of due process and denied equal protection.[2] Plaintiffs also claimed that conditions at the jail violated Texas statutory law. On June 5, 1972, after a trial on the merits, the district court issued a memorandum opinion and judgment. *Taylor v. Sterrett*, N.D.Tex., 1972, 344 F.Supp. 411. Noting that the County did "not contest the pendent jurisdiction of this Court to adjudicate the State law ques-

1. We have previously handed down three reported decisions in this case. In addition to the appeal from the district court's original judgment, *see Taylor v. Sterrett*, 5 Cir., 1974, 499 F.2d 367, which we discuss in the body of this opinion, we ruled on the appealability of one of the district court's subsequent orders, *see* 5 Cir., 1976, 527 F.2d 856, and issued a decision in an appeal concerning restrictions on inmate mail and a district court order prohibiting visits from representatives of the district attorney's office to prisoners without the inmates' consent. *See* 5 Cir., 1976, 532 F.2d 462. The latter two decisions did not involve issues pertinent to this appeal.

2. The inmates, who sued under 42 U.S.C. § 1983, sought a "declaratory judgment, preliminary and permanent injunction and other appropriate relief." Plaintiffs charged that they had been deprived of numerous rights, privileges and immunities guaranteed by the fourteenth amendment,

including (a) the right to be free from cruel and unusual punishment, (b) the right to be free. from arbitrary and capricious punish-

ment, (c) the right to minimal due process safeguards in decisions determing [sic] fundamental liberties, (d) the right to be fed, housed, clothed, and receive medical treatment so as not to be subjected to loss of health or life, (e) the right to unhampered and uncensored access to counsel and the courts, (f) the right to effective representation and preparation for trial, (h) the right to be presumed innocent, (i) the right to a fair trial, (j) the right to freedom of political and religious thought, (k) the right to freedom of association, (*l*) the right to freedom of speech and press, (m) the right to petition the government for redress of grievances [sic], (n) the right to be free from the abuses of fellow prisoners in all aspects of daily life, (*o*) the right to be free from racial segregation, (p) the right to minimal recreational opportunities, (q) the right to even minimal standards of comfort, and sanitary facilities.

(Letter g missing in complaint.)

tion," *id.* at 418, the trial judge found "that the county does not provide the minimum facilities required by" Texas state law. *Id.* at 421. She enjoined the County "from

3. In view of the foregoing conditions at the Dallas County jail, it is the Judgment of this Court:

1. The Commissioners Court is enjoined from further violating the provisions of Article 5115 of the Texas Revised Civil Statutes and is directed to provide immediately as follows:

a. Sufficient cells and tanks to accommodate a number of inmates equal to the largest number in the Dallas County jail during 1972 in any one day.

b. Solitary cells of not less than 40 sq. feet, provided with a bunk, water closet and a combination drinking fountain and lavatory.

c. The capacity of the hospital ward for men shall be increased and bunks provided for all patients confined therein.

d. Padded cells with hammocks for insane persons.

It is suggested in this connection that the old jail be renovated and the women's floor in the new jail be redesigned to accommodate both male and female inmates. A reasonable time for the completion of these improvements in the opinion of the Court is six months. Even with such remodeling and repairs the provisions of Article 5115 will not be wholly complied with. The Court directs that the Commissioners Court make immediate plans for full compliance within a reasonable time. A Regional Jail is a possible answer to the complete fulfillment of these requirements but plans for a Regional Jail are not sufficient reason for the failure to implement all the statutory provisions for a "safe and suitable" jail as required by Article 5115.

2. The Commissioners Court is directed to provide an outdoor area for exercise and a rehabilitative program of recreation. As a temporary arrangement it is suggested that the roof of the jail be remodeled to provide for such facilities, the possibility for which was suggested by the Sheriff. In a permanent plan for new facilities, quarters should be provided for chapel services and educational programs.

3. The Commissioners Court is directed to provide jail guards sufficient for security of jail facilities without the use of inmate assistance.

4. The permanent injunction heretofore issued relating to censorship of mail is affirmed and carried forward in this judgment. The Sheriff is directed not to open or censor mail transmitted between inmates of the jail and the following persons: courts, prosecuting attorneys, probation and parole officers, governmental agencies, lawyers and the press.

5. The preliminary injunction, heretofore issued relating to the destruction of reading matter belonging to inmates is made a permanent

further violating" state law and directed it "to provide immediately" extensive changes in the jail's physical makeup and operating procedures.[3] The district court did not hold injunction and the Sheriff and other jail officials are enjoined from destroying law books, legal materials, legal documents, books, magazines and newspaper clippings provided such material is maintained in good condition and does not create a fire or health hazard.

6. While this Court will not interfere in the standards set up by the Sheriff for inmates receiving magazines or books, it appears that the policy has not been adhered to and the Sheriff is directed to see that greater care is exercised in determining the books and magazines made available to inmates so as to permit inmates to have reading material not prohibited and to restrict the receipt by inmates of prohibited material.

7. The Sheriff is directed to make effective the new policy relating to rules of conduct of inmates. These rules must be communicated to the inmates apprising them of what conduct can subject them to discipline, the penalty for infraction and the procedure by which such a determination will be made. Before any punishment for confinement of more than 3 days in solitary is inflicted hearings should be held. In case of the appeal of any sentence, the officer charging or sentencing the inmate should not be a member of the Board of Appeals.

8. The Sheriff is directed not to allow persons to see prisoners except with the consent or request of the inmates. This has particular reference to "copout" men, who have had free access to the jail.

9. The Sheriff is directed to inaugurate a classification system taking into consideration security, integration and status of inmates as to whether they are pretrial detainees or convicted inmates.

10. The Sheriff is enjoined from using inmates as corridor bosses to enforce rules and preserve discipline.

11. The Sheriff is directed not to use any cell of less than 40 square feet, not to place more inmates in cells and tanks than those such facilities are designed to accommodate, nor to place anyone in a solitary cell unless it is provided with a bunk, water closet and a combination fountain and lavatory.

12. The Sheriff is directed to have employees and inmates handling food examined by a licensed physician to detect the presence of communicable diseases as required by Article 705d of the Texas Penal Code.

Attorneys fees are denied. Costs are taxed against Defendants.

While this opinion closes this case it may be reopened within a reasonable time on application of the plaintiffs contending that Defendants are not making a diligent, good faith effort to comply with the order of this Court.

that conditions at the jail violated the Constitution.

The County appealed and we affirmed the trial court's judgment with only slight modification.[4] *Taylor v. Sterrett*, 5 Cir., 1974, 499 F.2d 367. We observed that "[i]t could hardly be expected that a United States District Court, in the exercise of appropriate pendent jurisdiction, would decline the enforcement of laws which the state, of its own volition, had enacted for the improvement of prison conditions within its jurisdiction," and concluded that the County's criticisms of "the decree with reference to state requirements at this jail" should be "left to the sound judicial discretion of the trial court, with full power to assay the merits of these criticisms and decree accordingly." *Id.* at 368. We remanded "the entire cause . . . to the District Court for the exercise of a retained jurisdiction." *Id.* at 369.

Since entering judgment in 1972, the district court has vigorously monitored the County's attempts to upgrade its prison system. The trial judge has paid numerous personal visits to the original jail and to subsequently opened facilities and has required the County to file a series of reports detailing its progress in improving conditions. Following each report, the court has issued an order appraising the County's efforts to date and identifying the topics to be covered in the next account. The court's orders and the County's ensuing reports have gone much beyond the scope of the 1972 decree, discussing in great detail both day-to-day administrative matters and issues of long-term policy planning.[5]

In an order dated February 8, 1977, the district judge expressed concern "about the overcrowded condition and security of the downtown jail and likewise of the underuse of" a new minimum security facility "as well as the activities carried on in all areas of the jail, and . . . the little progress being made in providing expanded quarters." To assist the court "in obtaining complete information" and "in evaluating the present Dallas County jail system," the judge appointed a Special Master—the retired warden of the Federal Correctional Institution at Fort Worth—and gave him "full authority" to visit facilities in the County system, question employees and prisoners and examine jail records.

*Taylor v. Sterrett, supra*, 344 F.Supp. at 422–23.

4. We noted "[a]s to Paragraph 7 of the District Court order, relating to rules of conduct of inmates . . . that the Sheriff has, . . . filed such rules with the District Court." Although we concluded that this issue was therefore "substantially moot," we stated that "the District Court will be free to enter any modification or amendments as may appear appropriate within" Supreme Court precedent. 499 F.2d at 368. Regarding Paragraph 8 of the District Court order, which directed the Sheriff "not to allow persons to see prisoners except with the consent or the request of the inmates," we called this provision "too restrictive, especially since the primary jurisdiction of the federal courts in this area is limited to the vindication of rights guaranteed by the federal constitution," and suggested that upon remand the district court attempt "specifically to limit this requirement to the evil it is intended to extirpate, if that evil does, in fact, rise to constitutional dimensions." *Id.* at 369.

5. For example, in an order dated October 9, 1974 the district court expressed an interest "in the attitude of inmates toward the use of closed TV for religious and exercise programs and of commercial channels for education and entertainment, and in the effect of such programs on the discipline in the jail. The Defendants are directed to report specifically on such results." Similarly, in her December 10, 1974 order, the district judge requested the Commissioners "to report specifically" on, among other things, "the effect of commercial television on the attitude of the inmates and its effect on rule violations, sick calls and the general atmosphere of the jail," as well as "the hiring of a full time dentist." The district court advised the County in an order dated June 23, 1975 that the adoption of a bond program to finance new jail facilities "should be the first objective of the Commissioner's Court," suggested that "[a] program to bring to the people information concerning the needs of the county in providing" an effective "criminal justice system should be adopted immediately and forthwith implemented," and stated that "[a]n informed electorate should therefore be the first objective of the Commissioner's Court." In her October 4, 1976 order, the trial judge "urged" the jail director "to try to obtain volunteers to assist in the library," and the sheriff "to continue to hire retired army personnel" for his department's Detentions Bureau.

The Special Master issued a report on April 14, 1977. After stating that he "was instructed to obtain comprehensive information about activities and conditions in Dallas County jail facilities," the Master proceeded to enumerate 25 wide-ranging recommendations concerning, among other things, jail design, training of officers and supervisors and relations between guards and inmates.[6] The report also commented upon the County's "progress toward compliance" with the 1972 decree.[7]

On April 25, the County filed a "Response to the Written Report of the Special Master." Besides attacking the Master's qualifications,[8] this document asserted that the district court "has repeatedly held that this case merely involves compliance with state law." While "there was no agency for en-

forcing state laws" when the court originally "retained jurisdiction of this case," the County pointed out that Texas had since established by statute a "Commission on Jail Standards," with "authority to promulgate and enforce minimum standards for county jails" and "broad powers . . . to close a county jail which does not comply with the standards and rules, as well as to enjoin violation of its orders, rules, or procedures or of" Texas law. Accordingly, the County prayed "that the Court . . . decline to retain further jurisdiction of this cause and remand same to the Texas Commission on Jail Standards."

The district judge entered an order on April 27 that referred in passing to "the completely irresponsible reply of the Commissioners' report to the Special Master's

---

6. In addition to numerous comments regarding the design of the existing jail, which he viewed as "the worst imaginable," the Special Master recommended the reorganization of "the Sheriff's Department staff in such a manner as to provide a clear distinction between detention officers and deputy sheriffs who have other duties." He suggested that supervisory personnel be sent "to some of the many institutes, seminars, and conferences on criminal justice, detention, and corrections," because "[o]ver time, this will result in many valuable contacts being made," and advised that "[t]he Sheriff's Department should be prepared to do without the jail director's services for several months . . . in order that he can get some training and be prepared to do his job adequately." The Master further recommended a thorough "scouring and cleaning" of the cells on two floors, in part because this activity "would be of great help in enabling the officers and inmates to get to know each other better," and urged "that the supervisors require the officers who work" the floors of the jail to "stay mobile, that they walk through the tank corridors frequently on non-scheduled basis" and "develop the practice of engaging in numerous casual conversations with the inmates." According to the Master, "[p]eople in confinement need to have a frequent means of expressing themselves," and "[c]asual ongoing banter with the personnel . . . relieves frustration, takes off the pressure, and results in a safer and more civil situation." The Master also advised changes in the allotment of soap powder and the frequency with which inmates' "underwear and socks" were laundered, suggested "an upgrading of the computer capability of the Sheriff's Department," discussed the need for hot food carts and recommended "that the opaque glass in the window slots on the outside walls

be replaced with transparent glass or plexiglass."

7. The Master reported that "[c]urrently used segregation cells . . . do not meet the standards provided" under Texas law, but noted that "it will not be physically possible for the County to achieve compliance with" state law regarding overcrowding "until new facilities become available." He said that the County had not yet constructed an outdoor recreation area, but added that "[t]he necessity for a place for outdoor recreation . . . is currently being taken into account by those involved in planning new facilities." Finally, the Master stated that the County had not developed "an adequate classification system," as required by the 1972 injunction. Otherwise, he concluded that the County had fully complied with the district court's original order.

8. The County asserted that "the Master's expertise is wholly limited to federal penitentiaries which serve an entirely different function" than do the County's jails, contended that his experience also involved "primarily . . . minimum security facilities," while the County system consisted "primarily [of] maximum security facilities," pointed out that the Master had no background in prison design, and noted that "the facilities planned by the Commissioners Court include," along with a new County jail, "other elements of a criminal justice system such as courts, clerk's offices, judges' chambers [and] sheriff's office. . . . The evidence fails to show that the Master has had any experience, operational or otherwise, in connection with such facilities rendering him completely lacking in qualifications to design or oversee the design of any such facilities."

report." Though she concluded that the County "is in compliance with most of the orders contained in the Court's order of June 5, 1972," the judge also approved all 25 of the Special Master's recommendations and issued 11 further directions to the County. On May 2, the County filed a "Motion for Separate Order," asking the court "to enter a separate document containing the eleven paragraphs of directions . . . found [in] its order dated April 27 . . . ." The court issued the requested separate order on May 12; its contents are set forth in the margin.[9]

The County appeals the orders of April 27 and May 12, which, in sum, informed the County that "[i]t is expected that" the Master's 25 recommendations "will be followed" and required the County to implement 11 additional changes in the jail system's organization and operating procedures. In addition, we necessarily construe the April 27 order as a denial of the County's motion that the district court "decline to retain further jurisdiction of this cause." [10]

## II. The District Court is Directed to Stop Exercising Jurisdiction and Dismiss

■ As Mr. Justice Powell declared in *Procunier v. Martinez*, federal courts hearing inmate challenges to prison conditions must "take cognizance of constitutional claims whether arising in a federal or state institution. When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will dis-

---

9. Under the May 12 order,

1. The Commissioners are directed by July 15, 1977, to select a site for new facilities, to enter into a contract for the purchase of same and to have adopted a plan for jail and court facilities to be completed by July 15, 1979. Otherwise, the jail will be immediately closed to any new inmates.

2. Beginning on May 2, 1977, the Sheriff is directed not to accept any inmates beyond the capacity of each of these two facilities.

3. The Commissioner's Court is directed to provide sufficient deputies to the Sheriff for the security of the jail and for county patrol. Undoubtedly citizens of this county are interested in having a safer and secure jail to house criminals and to patrol the county to prevent crime and to serve warrants and other court writs. The Court noted with satisfaction from the newspapers that $300,000 had been released by the Commissioner's Court to the Sheriff for his needs. While this Court is not sufficiently informed to determine the exact number of deputies needed or the amount of money needed, it is obvious that the present number is insufficient.

4. The Sheriff is directed to inaugurate a systematic means of selecting inmates for Woodlawn so as to materially increase their number. With an improved system this is possible. The number should reach 200 to 250 inmates.

5. The Sheriff is directed to provide at least one hour per week of outdoor exercise for each Woodlawn inmate.

6. The Sheriff is directed to furnish sufficient deputies for fully implementing the exercise and closed circuit TV programs. It is impossible for the deputy in charge of these programs to perform his duties adequately without additional assistance.

7. The Commissioner's Court is directed to furnish food carts adequate to serve hot food for every floor of the jail.

8. The Sheriff is directed to improve mail handling procedure so that letters from lawyers and the courts are not even inadvertently opened.

9. The Commissioner's Court is directed to expand the pre-trial release program.

10. The Commissioner's Court is directed to furnish more adequate facilities for visiting between inmates and their families.

11. The Commissioner's Court and Sheriff are directed to file their next report on August 1, 1977. Said report shall include progress on all matters herein ordered except the items on which an earlier report has been ordered. The Sheriff is also directed to include in his report the daily number of inmates in each of the jail facilities from July 15th to July 30th, 1977. The report should also include plans for the future use of the present downtown facilities.

10. Plaintiffs contend that the April 27 and May 12 orders are not appealable. However, under 28 U.S.C. § 1292(a)(1) the courts of appeals have jurisdiction of appeals from interlocutory orders of the district courts "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions . . . ." In our view, the two orders appealed from, by issuing further directions to the County, have the effect of modifying the district court's 1972 injunction. Moreover, the County's response to the report of the Special Master asked the district court to "decline to retain further jurisdiction"; we interpret this request as a motion to dissolve the original injunction and therefore regard the April 27 and May 12 orders as examples of the refusals "to dissolve or modify injunctions" contemplated by section 1292(a)(1).

charge their duty to protect constitutional rights." 416 U.S. 396, 405, 94 S.Ct. 1800, 1807–1808, 40 L.Ed.2d 224 (1974). This court has consistently fulfilled its obligation to safeguard the constitutional rights of prisoners in state institutions, affirming numerous decisions of the district courts that granted inmates extensive relief and ordered fundamental change in prison facilities and procedures. *See, e.g., Newman v. Alabama,* 5 Cir., 1977, 559 F.2d 283; *Williams v. Edwards,* 5 Cir., 1977, 547 F.2d 1206; *Gates v. Collier,* 5 Cir., 1974, 501 F.2d 1291. In this case, moreover, even without a finding of constitutional infirmity we upheld a wide-ranging order requiring the County's jail system to comply with Texas state law. However, we have always recognized that "[t]he Supreme Court has articulated for the federal courts a policy of minimum intrusion into the affairs of state prison administration; state prison officials enjoy wide discretion in the operation of state penal institutions." *Williams v. Edwards, supra,* 547 F.2d 1206, at 1211–1212. This "policy of minimum intrusion" flows from an awareness that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities." *Procunier v. Martinez, supra,* 416 U.S. at 405, 94 S.Ct. at 1807. *See, e.g., Newman v. Alabama, supra,* 559 F.2d at 286; *Williams v. Edwards, supra,* 547 F.2d at 1211–12; *Newman v. Alabama,* 5 Cir., 1974, 503 F.2d 1320, 1328; *Gates v. Collier, supra,* 501 F.2d at 1301; *Taylor v. Sterrett, supra,* 499 F.2d at 369; *Cruz v. Hauck,* 5 Cir., 1973, 475 F.2d 475, 476; *Taylor v. Sterrett, supra,* 344 F.Supp. at 412. Thus, we have cautioned that ". . . in the prison context . . . federal courts should keep their eyes on the main objective, the Eighth Amendment command for the eradication of cruel and unusual punishment. The remedy must be designed to accomplish that goal, not to exercise judi-

cial power for the attainment of what we as individuals might like to see accomplished in the way of ideal prison conditions." *Newman v. Alabama, supra,* 559 F.2d at 287.

■ The district judge deserves the commendation of this court and the Dallas community for her vigilance in ensuring that the County obey the 1972 judgment. We are convinced, however, that the district court's role in the process of improving the Dallas jails is now complete. The objects sought to be accomplished in the original suit have been accomplished. That which was sought to be remedied has now been remedied. Under the circumstances, we conclude that the trial judge should have granted the County's motion that the court "decline to retain further jurisdiction of this cause and remand same to the Texas Commission on Jail Standards."

Throughout this lengthy litigation, neither we nor the district court have ever held that the conditions in the County's jails involved in this appeal violate the Constitution. In her initial 1972 decision, the trial judge simply found that the County's penal system did not conform to Texas state law. As we read the various subsequent orders of the district court and the Special Master's report, the County now stands in substantial compliance with both Texas state law and the 1972 decree of the district court. Counsel for plaintiff inmates conceded as much during oral argument. With regard to the issue of overcrowding, for example, the central concern of the 1972 order, plaintiffs' attorney said in oral argument that this is currently "no particular . . . problem," since the Dallas County system now has significant *excess* capacity. Furthermore, County voters have passed a major bond issue to finance construction of a new jail, which is now under way, making the problem of overcrowding unlikely to occur.

Moreover, in 1975, the State of Texas by statute created a Commission on Jail Stan-

dards to enforce a state policy "that all county jail facilities . . . conform to certain minimum standards of construction, maintenance, and operation."[11] The Com-

11. Article 5115 of the Texas Revised Civil Statutes Annotated provides:

The Commissioners Court shall provide safe and suitable jails for their respective counties, and shall cause the same to be maintained in good sanitary condition at all times, properly ventilated, heated and lighted; structurally sound, fire resistant and kept in good repair. Furthermore, they shall cause the jails in their respective counties to be kept in a clean and healthy condition, provided with water of safe quality and ample quantity and sewer disposal facilities in accordance with good sanitary standards, and provided with clean, comfortable mattresses and blankets, sufficient for the comfort of the prisoners, and that food is prepared and served in a palatable and sanitary manner and according to good dietary practices and of a quality to maintain good health. Such jails shall comply with the provisions of this Act and with the rules and procedures of the Commission of Jail Standards.[1]

SUITABLE SEGREGATION

The term "safe and suitable jails," as used in this Act, shall be construed to mean jails which provide adequate segregation facilities by having separate enclosures, formed by solid masonry or solid metal walls, or solid walls of other comparable material, separating witnesses from all classifications of prisoners; and males from females; and juveniles from adults; and first offenders, awaiting trial, from all classifications of convicted prisoners; and prisoners with communicable or contagious diseases from all other classifications of prisoners. Furthermore, the term "safe and suitable" jails shall be construed to mean jails either now or hereafter constructed, except that, in lieu of maintaining its own jail, any county whose population is not large enough to justify building a new jail or remodeling its old jail shall be exempt from the provisions of this Act by contracting with the nearest available county whose jail meets the requirements set forth in this Act for the incarceration of its prisoners at a daily per capita rate equal to the cost of maintaining prisoners in said jail, or at a daily rate mutually agreed to by the contracting counties.

No person suspected of insanity, or who has been legally adjudged insane, shall be housed or held in a jail, except that such a person who demonstrates homicidal tendencies, and who must be restrained from committing acts of violence against other persons, may be held in a jail for a period of time not to exceed a total of twenty-four (24) hours, during which period he shall be kept under observation continuously. At the end of the twenty-four (24) hour period, such person shall be released or taken to a hospital or mental hospital. Furthermore, for such temporary holding of each person suspected of insanity, or who has been legally adjudged insane, there shall be provided a spe-

cial enclosure or room, not less than forty (40) square feet and having a ceiling height of not less than eight (8) feet above the floor. Furthermore, the floor and the walls of such enclosure shall be provided with a soft covering designed to protect a violent person, temporarily held therein, from self-injury or destruction. One hammock, not less than two (2) feet, three (3) inches wide and six (6) feet, three (3) inches long, made of elastic or fibrous material shall be provided in each such special enclosure.

SUITABLE SECURITY AND SAFETY

For the purpose of this Act, the term "safe and suitable jails" is further defined to mean jails which provide adequate security and safety facilities by having separate cells or compartments, dormitories, and day rooms, of varying dimensions and capacities for prisoners confined therein, except that, if practicable, no one such cell or compartment shall be designed for confining two (2) prisoners only. Cells or compartments shall be designed to accommodate from one (1) to eight (8) prisoners each, and furthermore, such dormitories and day rooms shall be designed to accommodate not more than twenty-four (24) prisoners each. Furthermore, in each such jail there shall be provided individual one-man or one-woman cells to accommodate not less than thirty per cent (30%) of the total designated prisoner capacity of the jail and dormitory-type space may be provided to accommodate not more than forty per cent (40%) of the total designated prisoner capacity of the jail. All cells, compartments and dormitories for sleeping purposes, where each such cell, compartment or dormitory is designed to accommodate three (3) or more prisoners, shall be accessible to a day room to which prisoners may be given access during the day. Cells for one (1) prisoner only shall have a minimum floor area of forty (40) square feet and all other cells, compartments, dormitories and day rooms (including safety vestibule area) shall have a minimum floor area equal to eighteen (18) square feet for each prisoner to be confined therein. The ceiling height above finished floor shall be not less than eight (8) feet for any cell, compartment, dormitory or day room where prisoners are confined.

The term "safe and suitable jails," as used in this Act, is further defined to mean that, for reasons of safety to officers and security, the entrance and/or exit to each group of enclosures forming a cell block or group of cells and/or compartments used for the confinement of three (3) or more prisoners shall be through a safety vestibule having one (1) or more interior doors in addition to the main outside entrance door to such cell block, all arranged to be locked, unlocked, opened or closed by control means located outside of any such enclosure or cell block.

mission has comprehensive powers over the construction and maintenance of county jails, the custody and treatment of prisoners, the number of supervisory personnel and the conduct of education, recreation and rehabilitation programs. It also has the authority to close nonconforming facilities.[12] Unlike the federal courts, therefore,

### SUITABLE SANITATION AND HEALTH

The term "safe and suitable jails" is further defined to mean jails which provide adequate facilities for maintaining proper standards in sanitation and health. Each cell designed for one (1) prisoner only shall be provided with a water closet and a combination lavatory and drinking fountain, table and seat. Each cell, compartment or dormitory designed for three (3) or more prisoners, shall be provided with one (1) water closet and one (1) combination lavatory and drinking fountain for each twelve (12) prisoners or fraction thereof to be confined therein. Furthermore, all such cells, compartments and dormitories shall be provided with one (1) bunk, not less in size than two (2) feet, three (3) inches wide and six (6) feet, three (3) inches long, for each prisoner to be confined therein. Furthermore, each day room for the confinement of three (3) or more prisoners shall be provided with one (1) water closet, one (1) combination lavatory and drinking fountain and one (1) shower bath for each twelve (12) prisoners, or fraction thereof, to be confined therein. Furthermore, each day room shall be otherwise suitably furnished.

The provision of this Act, as amended, shall become applicable to all jails upon its effective date. The standards prescribed by this Act are minimum standards only. The provisions of this Act are enforceable by the Commission on Jail Standards.[1]

Amended by Acts 1975, 64th Leg., p 1283, ch. 480, § 15, eff. June 19, 1975.

**12.** Article 5115.1 provides:

### Policy

Section 1. It is the policy of the State of Texas that all county jail facilities in the state conform to certain minimum standards of construction, maintenance, and operation. It is the purpose of the legislature by this Act to implement this policy by establishing a commission on jail standards with the authority and responsibility to administer the provision of this Act and other laws relating to standards for county jails.

### Definitions

Sec. 2. In this Act:

(1) "Commission" means the Commission on Jail Standards.

(2) "Executive director" means the executive director of the Commission on Jail Standards.

(3) "County jail" means any jail, lockup, or other facility that is operated by or for a county for the confinement of persons accused or convicted of an offense.

(4) "Prisoners" means persons confined in a county jail.

### Commission created

Sec. 3. The Commission on Jail Standards is created.

### Membership—appointment, terms, vacancies

Sec. 4. (a) The commission consists of nine members appointed by the governor with the advice and consent of the senate. Two members shall be county sheriffs, one from a county with a population of over 200,000 persons and one from a county with a population of 200,000 or less, according to the latest United States census. One member shall be a county judge; one shall be a practitioner of medicine licensed by the State Board of Medical Examiners; the other five positions shall be filled by citizens of the state who hold no public office. The sheriffs and the county judge appointed to the commission shall perform the duties of a member of the commission in addition to their other duties.

(b) Except as provided by Subsection (c) of this section, members are appointed for a term of six years expiring on January 31 of an odd-numbered year.

(c) For terms that begin within 60 days after the effective date of this Act, the governor shall appoint:

(1) three members for terms that expire on January 31, 1981;

(2) three members for terms that expire on January 31, 1979; and

(3) three members for terms that expire on January 31, 1977.

(d) If a sheriff or county judge on the commission ceases to hold office or if a vacancy otherwise occurs in the membership of the commission, the governor shall appoint a replacement who possesses the same qualifications as the member who vacated his position, with the advice and consent of the senate, to serve the unexpired portion of the term. If a vacancy occurs at a time when the senate is not in session, the vacancy shall nevertheless be filled on an interim basis, and the interim appointee shall serve as a member of the commission until his nomination has been acted on by the senate.

### Chairman; vice-chairman

Sec. 5. The commission shall biennially elect one of its members chairman and one vice-chairman for a term of two years beginning on February 1 of each odd-numbered year.

### Meetings; quorum; rules

Sec. 6. (a) The commission shall hold a regular meeting each calendar quarter and may hold special meetings at the call of the chairman or on the written request of three members. The chairman, or in his absence, the vice-chairman, shall preside at all meetings of the commission.

(b) Five members constitute a quorum for the transaction of business.

(c) The commission shall adopt, amend, and rescind rules for the conduct of its proceedings.

### Expenses

Sec. 7. Members of the commission are not entitled to compensation but are entitled to reimbursement for actual and necessary expenses incurred in performing their official duties.

### Director; staff

Sec. 8. (a) The commission shall employ an executive director to serve at the will of the commission. The executive director is subject to the policy direction of the commission and is the chief executive officer of the commission.

(b) The executive director may employ personnel as necessary to enforce and administer this Act.

(c) The executive director and employees are entitled to compensation and expenses as provided by legislative appropriation.

### Duties of the commission

Sec. 9. (a) The commission shall:

(1) promulgate reasonable rules and procedures establishing minimum standards for the construction, equipment, maintenance, and operation of county jails;

(2) promulgate reasonable rules and procedures establishing minimum standards for the custody, care, and treatment of prisoners;

(3) promulgate reasonable rules establishing minimum standards for the number of jail supervisory personnel and for programs and services to meet the needs of prisoners;

(4) promulgate reasonable rules and procedures establishing minimum requirements for programs of rehabilitation, education, and recreation in county jails;

(5) revise, amend, or change rules and procedures if necessary, in a manner not inconsistent with this Act;

(6) provide consultation and technical assistance to local government officials with respect to county jails;

(7) review and comment on plans for the construction and major modification or renovation of county jails;

(8) require that the sheriff and commissioners of each county submit to the commission, on a form prescribed by the commission, an annual report on the conditions in each county jail within their jurisdiction, including all information necessary to determine compliance with state law, commission orders, and the rules promulgated under this Act;

(9) review the reports submitted under Subdivision (8) of this subsection and require its employees to inspect county jails regularly to insure compliance with state law, commission orders, and rules and procedures promulgated under this Act; and

(10) determine annually, or more often, whether each county jail is in compliance with the rules and procedures promulgated under this Act.

(b) The fact that compliance with a commission rule or procedure requires major modification or renovation of an existing jail or construction of a new jail does not render a commission rule or procedure unreasonable.

### Annual report

Sec. 10. The commission shall make a report to the governor, the lieutenant governor, and the speaker of the house of representatives, not later than January 31 of each year, covering its operations, its findings concerning county jails during the preceding year, and whatever recommendations it deems appropriate.

### Enforcement of jail standards

Sec. 11. (a) The commission shall be granted access at any reasonable time to any county jail facility or part of any county jail facility and shall be granted access to all books, records, and data pertaining to any county jail which the commission or the executive director deems necessary for the administration of the commission's functions, powers, and duties. The commissioners and sheriff of each county shall furnish the commission or any of its members, or the executive director or any employee designated by the executive director, any information which he states is necessary to enable the commission to discharge its functions, powers, and duties, to determine whether its rules are being observed or whether its orders are being obeyed and otherwise to implement the purposes of this Act. In the exercise of its function, powers, and duties, the commission may issue subpoenas and subpoenas duces tecum to compel the attendance of witnesses and the production of books, records, and documents, administer oaths, and take testimony concerning all matters within its jurisdiction. The commission is not bound by strict rules of evidence or procedure in the conduct of its proceedings, but its determinations shall be founded on sufficient legal evidence to sustain them. The commission may delegate to the executive director the authority conferred by this subsection.

(b) When the commission finds that a county jail is not in compliance with state law, or the rules and procedures of the commission, or fails to meet the minimum standards prescribed by the commission or by state law, it shall report the noncompliance to the commissioners and sheriff of the county responsible for the jail that is not in compliance. The commission shall send a copy of the report to the governor.

(c) The commission shall grant the county or sheriff a reasonable time, not to exceed one year after a report of noncompliance, to comply with its rules and procedures and with state law. On application of the sheriff or commissioners of a county, if clearly justified by the facts and circumstances, the commission may

which "are not prison managers," *Cruz v. Hauck, supra,* 475 F.2d at 476, the Commission is charged with supervising day-to-day administration and long-term planning in Texas county jails. The establishment of this body indicates a strong state commitment to improving conditions in those jails and, coupled with the fact that this case involves no federal constitutional violations, creates an especially compelling need for federal judicial "deference to the appropriate prison authorities." *Procunier v. Martinez, supra,* 416 U.S. at 405, 94 S.Ct. at 1807. Thus, it is apparent that control of the County jails must now be returned to local and state jurisdiction, since the role of the federal court in this matter is now complete.

Accordingly, we vacate the orders of April 27 and May 12, 1977, as well as all other orders and stays that remain in ef-

[redacted]

grant reasonable variances for operation of county jails not in strict compliance with state law, except that no variance may be granted to permit unhealthy, unsanitary, or unsafe conditions.

(d) If the commissioners or sheriff does not comply within the time granted by the commission, the commission may, by order, prohibit the confinement of prisoners in the noncomplying jail and designate another detention facility for their confinement. If a prohibition and transfer order is issued, the sheriff of the county in which the noncomplying jail is situated shall immediately transfer all prisoners to the detention facility specified by the commission.

(e) The county responsible for a nonconforming jail shall bear the cost of transportation and maintenance of prisoners transferred from a noncomplying jail by order of the commission. The costs of transportation and maintenance shall be determined by the commission and shall be paid into the treasury of the entity operating the detention facility to which the prisoners are transferred.

(f) The commission, in lieu of closing a county jail, may institute an action in its own name to enforce, or enjoin the violation of, its orders, rules, or procedures, or of Article 5115, Revised Civil Statutes of Texas, 1925, as amended. The commission shall be represented by the attorney general. An action brought pursuant to this subsection is in addition to any other action, proceeding, or remedy provided by law, and may be brought in a district court of Travis County. A suit brought under this subsection shall be given preferential setting and shall be tried by the court, without a jury. The court shall issue an injunction ordering compliance if it finds:

(1) that the county jail is being operated in such a manner that it does not comply with the rules and procedures promulgated by the commission or with state law; and

(2) that the commissioners or sheriff has been given a reasonable time to comply with the rules and procedures and has failed to do so.

**Judicial review**

Sec. 12. (a) A county may appeal a commission order issued under Subsection (d), Section 11, of this Act by filing a petition in a district court of Travis County.

(b) The petition must be filed within 30 days after the date of the commission's order.

(c) Service of citation on the commission must be accomplished within 30 days after the date the petition is filed. Citation may be served on the executive director.

(d) In an action brought under this section, the court is confined to the record developed by the commission, and the only issues before the court are:

(1) whether the order of the commission is based on substantial evidence; and

(2) whether the order is arbitrary, capricious, or illegal.

**Regulations**

Sec. 13. (a) The commission shall promulgate the regulations required by Section 9 of this Act on or before January 1, 1977.

(b) On or before March 1, 1977, the commission shall mail a copy of the regulations promulgated pursuant to Section 9 of this Act to each county sheriff in this state. The chairman shall certify to the governor that the commission has complied with the requirements established by this section.

**Qualifications of jail personnel**

Sec. 14. (a) The Commission on Law Enforcement Officer Standards and Education shall establish minimum physical, mental, educational, and moral standards for persons employed or utilized in the operation of county jails.

(b) The authority and power of the Commission on Law Enforcement Officer Standards and Education is extended to cover all county jail personnel. The staff of the Commission on Law Enforcement Officer Standards and Education shall be enlarged sufficiently to discharge the additional responsibilities imposed by this section. Counties shall have a period of one year following establishment of standards for county jail personnel within which to have all jail personnel certified by the Commission on Law Enforcement Officer Standards and Education.

Acts 1975, 64th Leg., p. 1278, ch. 480, §§ 1 to 14, eff. June 19, 1975.

fect, and remand with directions to the district court to discontinue the further exercise of its retained jurisdiction and to dismiss the cause.[13]

VACATED AND REMANDED.

13. Given our action today, we need not specifically discuss the County's objection to that portion of the April 27 and May 12 orders which directed the County "to provide sufficient deputies to the Sheriff . . . to patrol the county to prevent crime and to serve warrants and other court writs."